[Cite as *State v. Wolfert*, 2026-Ohio-2850.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL NO.   C-250448
                                                   TRIAL NO.    B-2403966
    Plaintiff-Appellee,          :

  vs.                                 :

STEVEN WOLFERT,                         :          *JUDGMENT ENTRY*

    Defendant-Appellant.         :


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed 50% to appellant and 50% to appellee.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 7/24/2026 per order of the court.**


**By:**_____
       **Administrative Judge**

[Cite as *State v. Wolfert*, 2026-Ohio-2850.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,               :        APPEAL NO.   C-250448
                                      TRIAL NO.    B-2403966
    Plaintiff-Appellee,      :

 vs.                         :

STEVEN WOLFERT,              :            *O P I N I O N*

    Defendant-Appellant.     :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: July 24, 2026


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Kollin Firm, LLC*, and *Thomas M. Kollin,* for Defendant-Appellant.

**Bock, Judge.**

**{¶1}** Defendant-appellant Steven Wolfert appeals his rape, strangulation, and domestic-violence convictions. In four assignments of error, Wolfert argues that trial counsel conceded guilt during his opening statement in violation of his Sixth Amendment rights, that his convictions for rape are supported by insufficient evidence and are contrary to the weight of the evidence, that the trial court erred when it imposed consecutive sentences, and that the trial court abused its discretion when it denied his request for a continuance.

**{¶2}** We overrule Wolfert's first, second, and fourth assignments of error. First, trial counsel's concession of guilt violates a defendant's Sixth Amendment rights only when the record shows that the concession was made without the defendant's consent. Here, the record does not suggest that counsel unilaterally conceded Wolfert's guilt. Next, Wolfert's rape convictions were supported by sufficient evidence and the weight of the evidence where the victim's testimony, corroborated by Wolfert's threat to kill the victim unless she engaged in sexual conduct, proved that Wolfert used the threat of force to purposely compel the victim to submit. And the trial court reasonably denied Wolfert's request for a seventh continuance because his request was indefinite as it did not identify a date when his witness would be available.

**{¶3}** But we sustain his third assignment of error and hold that Wolfert's sentence is contrary to R.C. 2929.14(C)(4) because the trial court failed to make the necessary statutory findings at Wolfert's sentencing hearing when it imposed consecutive sentences. We reverse the trial court's imposition of consecutive sentences and remand the cause to the trial court to determine whether consecutive sentences are appropriate and justified under R.C. 2929.14(C)(4).

## I. *Factual and Procedural History*

**{¶4}** The State charged Wolfert for two counts of rape in violation of R.C. 2907.02(A)(2), strangulation in violation of R.C. 2903.18(B)(2), and domestic violence in violation of R.C. 2919.25(A).

**{¶5}** Minutes before his trial was scheduled to begin, Wolfert moved for a continuance because his mother was unavailable to testify in his defense. The trial court denied Wolfert's motion.

## A. *Wolfert's trial*

**{¶6}** During its opening statement, the State informed the jury that the evidence would prove that Wolfert struck, strangled, and then forced his then-wife A.W. to engage in sexual acts. In response, Wolfert's trial counsel remarked to the jury during his opening statement:

I'm going to tell you something that . . . I [don't] think I have ever told a jury before, which is at the end of this trial, I expect you to find Steven guilty of some of these charges. I can't think of a time that I have ever told a jury that. In fact, at the end of this case, I expect that you are going to convict Steven of domestic violence. I expect that you're going to find Steven is guilty of strangulation.

Small point on that. There's a few types of strangulation. And you will be instructed on the different types of strangulation in Ohio, different types of strangulation and different charges involving strangulation. What Steven is currently charged with is strangulation where he is accused of causing or attempting to cause serious physical harm to [A.W.]. Serious physical harm is a defined concept. It is going

4

to be defined for you. It's going to be black and white, what does serious physical harm mean, X, Y, Z and it will be defined for you.

What I expect you to find Steven guilty of again in this trial is a different type of strangulation . . . that he choked [A.W.], his wife, and that he caused her physical harm. He caused her – attempted to cause her physical harm. One word different, physical harm versus serious physical harm. They're both going to be defined for you. You're going to see that the evidence does not support the current strangulation that Steven is charged with. And you're to find that it supports the other kind of strangulation. And the reason you're going to find that is because the evidence is clear today.

### 1. *The State's case*

{¶7} A.W. testified that she and Wolfert had two children during their marriage. She filed for divorce in January 2024 because of Wolfert's infidelity, addiction issues, and "controlling and toxic behavior." The two separated. Both Wolfert and A.W. enrolled in addiction treatment. They "talked about getting back together a few times" and had "a sexual relationship" during their separation.

{¶8} By August 2024, A.W. had moved the children into an apartment owned by Wolfert's mother, and Wolfert was expecting a child with his new girlfriend. A.W. suspected that Wolfert was returning to his old ways and seemed "a little more aggressive." Wolfert had threatened to disseminate sensitive and damaging information about A.W. to friends and family if A.W. did not perform sexual acts or allow Wolfert to control her. A.W. later told Wolfert that she was "done" with him.

{¶9} After a night of drinking, Wolfert used a discussion about their children as a pretext to visit A.W. in her apartment while their children were asleep. With one

foot in the door, Wolfert "ripped" A.W.'s cell phone out of her hands and began filming with his own cell phone. A.W. testified that Wolfert filmed 22 videos of Wolfert searching A.W.'s phone for conversations with other men, "assaulting" and "strangling" A.W., fellatio, and then vaginal intercourse. The State entered the footage into the record.

{¶10} A.W. explained that Wolfert had supported A.W. financially throughout the divorce proceedings, and at one point gave her $800 conditioned on Wolfert's ability to inspect her phone. Apparently, Wolfert had inspected A.W.'s phone in the past but became "obsessive" about it after their separation. In the footage of Wolfert inspecting A.W.'s phone, Wolfert remarked that he "caught" A.W. talking to other men. She testified that Wolfert disapproved of her "male friends" that she had slept "with for money."

a. Wolfert berated, choked, attacked, and threatened A.W.

{¶11} In one recording,[1] Wolfert can be heard bringing A.W. to the ground and threatening to "choke her." A.W. recalled that Wolfert was sitting on the floor with A.W. in a headlock "scrawled behind him" while she struggled to breathe. A.W. testified that Wolfert had pinned her to the floor using his bodyweight and she "knew better than to fight him at this time." As A.W. gasped for air, Wolfert interrogated her over the messages in her phone and demanded that A.W. admit to "everything [she's] fucking done." A.W. testified that "[Wolfert] would strangle me, ask me a question, and then lift them off." Eventually, Wolfert "started hitting" A.W.

{¶12} In other footage, Wolfert can be heard accusing A.W. of engaging in sex work and referencing the $800 that he gave her as she cried and begged him to stop.

---

[1] Wolfert's camera was pointed at the ground, so the recording is limited to audio.

Wolfert told her to "be quiet" and twice threatened to "murder" her. Minutes later, he threatened both her murder and his suicide when their divorce became final. And other footage includes the sound of Wolfert striking A.W. and her crying in response. Wolfert paused his attack to tell A.W. that he would murder her because he did not want his children to be "raised by a whore." In another recording, Wolfert threatened to "beat the fuck out of [A.W.'s] face until [it was] fucking bloody" if she refused to show him everything in her phone. A.W. testified that the strangulation caused her to feel lightheaded and "pass[] out" at one point.

{¶13} Wolfert ended his assault when one of their children woke and started to cry. A.W. attended to and soothed their child for roughly 25 minutes. Afterwards, Wolfert told A.W. that "he was going to be that guy on the news that killed his entire family and then himself," and A.W. would be "dead by sunrise."

b. Wolfert demanded oral and vaginal sex

{¶14} A.W. testified that Wolfert went to the bathroom and then sat on the couch "with his pants off" and "motion[ed] to . . . his penis." Fearing his threats to be true, A.W. "figured . . . having sex with him might increase [her] chance[]" of survival. Wolfert recorded A.W. as she performed fellatio.[2] A.W. testified that, at one point, she tried to stop and talk to Wolfert but he instructed her to "keep going." At another point, Wolfert asked about "Scott," grabbed at her neck, and then "swung at" her. A.W. described feeling that she had no control over the situation and no way to escape with her daughters.

{¶15} A.W. testified that Wolfert recorded two instances of vaginal intercourse with A.W. that night. A.W. bristled at the notion that the conversation during the

---

[2] With A.W. on the stand, the State tried to play all 15 recordings of the sexual acts before the trial court asked whether it was "crucial to brutalize the jury by watching every second of it?"

intercourse was "banter" and "casual," and clarified that she "was saying and doing whatever [she] could to stay alive" and to avoid antagonizing Wolfert after "he threatened the lives of [her] children."

c. The investigation

{¶16} After Wolfert left A.W.'s apartment the next morning to buy "drugs," A.W. contacted the police. A.W. went to the hospital for a medical and sexual-assault examination ("SANE"). The bodycam footage and A.W.'s hospital records were entered into the record. The treating physician observed "[n]umerous, moderate abrasions" on A.W.'s neck and "left-sided facial swelling and bruising." The SANE nurse described her examination of A.W., and her report was entered into the record.

{¶17} A sheriff's deputy testified that, during an interview, Wolfert showed officers his recordings. As a result of those recordings, officers secured a search warrant for Wolfert's phone.

### 2. *Wolfert's defense*

{¶18} Wolfert testified that his relationship with A.W. in 2024 was "on-again, off-again" and agreed that his behavior in the recordings was "heinous." But Wolfert claimed that his arguments with A.W. typically ended with "physical intimacy," the sexual dynamic between Wolfert and A.W. evolved throughout the divorce, and their new dynamic was reflected in the recordings played at trial.

{¶19} Wolfert recalled drinking "[h]eavily" and using cocaine on the night in question. He felt his demeanor changing after seeing "signs that [A.W.] is not holding upstanding morals" and "being with other men for money." Wolfert agreed that he pinned A.W. to the ground after remarking that he "caught" A.W. messaging "Scott," but insisted that he was not "on top of [A.W.]." Wolfert agreed that A.W.'s responses to his questions made him "[a]bsolute[ly] furious."

8

**{¶20}** Wolfert agreed that he punched, choked, and threatened to murder A.W. but disagreed that she lost consciousness. He justified his actions by citing A.W.'s "verbal assault" on him and his dissatisfaction with A.W.'s answers to his questions. He admitted that A.W. was under duress that night, that he would have strangled her more if she refused to answer his questions, and that he threatened to murder A.W. to "intimidate" her. Later, Wolfert was "willing to admit the domestic violence and the strangulations, things we know happened." And when Wolfert was asked how long he punched and strangled A.W., Wolfert responded the question was irrelevant and admitted, "I'm guilty."

**{¶21}** Wolfert explained that his recordings depict an hour of his and A.W.'s entire night. According to Wolfert, his daughter awoke around 2:30 a.m. After she returned to sleep, he and A.W. calmed down, shared a meal, and had a lengthy conversation in which A.W. apologized to Wolfert. Wolfert recalled that sometime around 3:30 a.m., he remarked to A.W. that his $800 entitled him to the "[f]ull package" of "sexual conduct." He also recalled that A.W. referenced one of Wolfert's threats before she performed fellatio. Wolfert responded to A.W. that he "might" carry out that threat. He testified that he was "let[t]ing her know that if she's not truly sorry about her prostitution, that an event like that, as a final straw, could possibly happen again." But he testified that he did not intend to coerce A.W. into performing fellatio and insisted that the sexual contact was consensual.

## B. Verdict and sentencing

**{¶22}** The jury found Wolfert guilty of both counts of rape, strangulation, and domestic violence. The trial court imposed an aggregate sentence of 15 to 18 years in prison: a six-to-nine-year sentence on one rape count, six years on the second rape count, and three years on the strangulation count, all to be served consecutively. It also

imposed an 180-day sentence for domestic violence, to be served concurrently with the consecutive sentences.

## II. *Analysis*

{¶23}   Wolfert challenges his convictions and sentences in four assignments of error. First, Wolfert argues that trial counsel's concessions during his opening statement violated Wolfert's Sixth Amendment rights. Second, he argues that his rape convictions are contrary to the weight and sufficiency of the evidence, because, in his view, the State did not prove that he compelled A.W. to submit to sexual conduct by force. Third, he maintains that his consecutive sentences are contrary to law. Finally, he insists that the trial court abused its discretion when it denied his motion for a continuance.

### A. *First assignment of error: Wolfert's counsel was not ineffective*

{¶24}   Wolfert argues that trial counsel's concession of guilt during his opening statement amounted to a de facto guilty plea to the strangulation and domestic-violence charges and violated Wolfert's Sixth Amendment rights.

#### 1. *Conceding guilt under the Sixth Amendment*

{¶25}   The Sixth Amendment to the United States Constitution guarantees a person accused of a criminal offense "the right . . . to have the Assistance of Counsel for his defence." Of course, "'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984), quoting *McMann v. Richardson*, 397 U.S. 759, 771, fn. 14 (1970). Counsel deprives a defendant of his right to the effective assistance of counsel "by failing to render 'adequate legal assistance.'" *Id.*, quoting *Cuyler v. Sullivan,* 446 U.S. 335, 344 (1980).

{¶26}   Wolfert initially argues that trial counsel's concession of Wolfert's guilt during opening statements violated his right to the effective assistance of counsel

10

under the Sixth Amendment.[3] Under *Strickland,* a defendant raising an ineffective-assistance-of-counsel claim "must show that counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland* at 687.

**{¶27}** To prove that counsel's performance was deficient, Wolfert must demonstrate that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. That analysis turns on whether trial counsel's assistance was "outside the wide range of professionally competent assistance," considering both the circumstances of the case and all "prevailing professional norms." *Id.* at 690. We presume "that counsel's performance falls within the wide range of reasonable professional assistance." *Id.* at 689. So, we refrain from second guessing a legitimate trial strategy. *State v. Reinhardt*, 2014-Ohio-4071, ¶ 16 (1st Dist.). But we may not rehabilitate counsel's performance with "'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011), quoting *Wiggins v. Smith*, 539 U.S. 510, 526-527 (2003).

**{¶28}** Wolfert argues that counsel's performance was deficient because conceding guilt to "multiple felonies" during his opening statement contradicted

---

[3] In his appellate brief, Wolfert cites *Strickland* and argues that the concessions "are deficient for several reasons," and "[t]he prejudice from counsel's concessions extends beyond the specific charges conceded," and that "[t]here is a reasonable probability that if defense counsel had not made these extraordinary concessions in opening statement, the jury would have acquitted Mr. Wolfert of at least some charges." Appellant's Brief at 11, 13, 16. But he argues in his reply brief that the State's responsive argument "ignores the Supreme Court's explicit holding in *McCoy*" and that "*McCoy,* not *Strickland,* provides the controlling framework." Appellant's Reply Brief at 2-3. While reply briefs offer an opportunity to respond to the appellee's argument, Wolfert's reply brief risks abandoning his claim on appeal. *See In re G.J.A.,* 2018-Ohio-2838, ¶ 18, fn. 5 (8th Dist.) ("Mother abandons this assigned error in her reply brief."); *see also State v. Shedwick*, 2012-Ohio-2270, ¶ 49 (10th Dist.) ("In his reply brief, appellant concedes that Pelfrey does not apply to the aggravated robbery and aggravated burglary charges against him, thus abandoning the initial argument in support of his fifth assignment of error."); *City of Columbus v. Reiner*, 2018-Ohio-975, ¶ 22 (10th Dist.) ("in appellant's reply brief he apparently abandons this claim"); *State v. Murnahan*, 117 Ohio App.3d 71 (2d Dist. 1996) ("In his reply brief, Murnahan abandoned this argument.").

Wolfert's not-guilty pleas, invited the jury to accept the State's framing of the case, and was not a tactical or strategic decision.

**{¶29}** But a closer reading of trial counsel's opening statement reveals that trial counsel did not concede guilt to strangulation as charged in Count 3. In the indictment, the State alleged that Wolfert committed strangulation in violation of R.C. 2903.18(B)(2), which requires proof that Wolfert "[c]reate[d] a substantial risk of serious physical harm [to A.W.] by means of strangulation or suffocation." Strangulation that causes a substantial risk of serious physical harm is a third-degree felony. *See* R.C. 2903.18(C)(2). By contrast, strangulation is a fourth-degree felony if the strangulation of a family member results in "physical harm." R.C. 2903.18(B)(3) and (C)(3). During his opening statement, counsel for Wolfert told the jury, "[T]he evidence does not support the current strangulation that Steven is charged with" and instead proved that Wolfert caused or "attempted to cause [A.W.] physical harm." Considering the recordings and medical evidence describing injuries to A.W.'s neck, counsel's suggestion that Wolfert's actions constituted a lesser-included offense falls within the range of legitimate trial strategy.

**{¶30}** Still, trial counsel conceded guilt to domestic violence as charged. Under the Sixth Amendment both "[t]rial management" and "strategic choices about how best to *achieve* a client's objectives" fall within counsel's "province." (Emphasis added.) *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018). But "defense counsel has control over trial-management decisions." *State v. Ward*, 2019-Ohio-4148, ¶ 23 (1st Dist.). In general, counsel's opening statement is an aspect of trial management that "falls within the realm of trial tactics." *See State v. Parker*, 2026-Ohio-343, ¶ 11 (5th Dist.). Opening statements are defense counsel's opportunity to reframe the case and offer "the jury a roadmap for evidence sought to be presented at the trial." *State v.*

*Godfrey*, 2025-Ohio-1575, ¶ 21 (1st Dist.). Indeed, Wolfert recognizes that trial "'counsel is accorded latitude and allowed "fair comment" on the facts to be presented at trial.'" *Id.*, quoting *State v. Diar,* 2008-Ohio-6266, ¶ 145, quoting *State v. Leonard,* 2004-Ohio-6235, ¶ 157. So ordinarily, defense counsel's opening statement "does not signify ineffective assistance of counsel." *Parker* at ¶ 11.

**{¶31}** Wolfert initially cited *McCoy* in support of his argument that counsel's performance was deficient. In his reply brief, he insists that *McCoy* requires a structural-error analysis of Wolfert's trial counsel's concessions during opening statements. And he contends that trial counsel's concession in this case must be reviewed for structural error regardless of whether the record includes defendant's objection to the concession. Wolfert is correct that, in contrast to ineffective-assistance claims under *Strickland,* structural errors, "when present . . . [are] not subject to harmless-error review." *McCoy* at 427. But contrary to Wolfert's arguments, *McCoy* does not govern every concession of guilt by trial counsel.

## 2. *Conceding guilt is not always structural error*

**{¶32}** Before *McCoy,* the United States Supreme Court addressed the standard for reviewing defense counsel's concession of guilt in the guilt phase of a capital case in *Florida v. Nixon*, 543 U.S. 175 (2004). In *Nixon*, trial counsel conceded guilt after proposing the concession as a strategic decision and explaining its benefits on three occasions to the defendant, who "was generally unresponsive" and "never verbally approved or protested." *Id.* at 181. The *Nixon* Court reasoned that, consistent with the right to the effective assistance of counsel under the Sixth Amendment, defense "counsel undoubtedly has a duty to discuss potential strategies with the defendant." *Id.* at 178. The Court reasoned that conceding guilt after consulting with a

13

nonresponsive defendant "must be judged in accord with the inquiry generally applicable to ineffective-assistance-of-counsel claims" under *Strickland. Id.*

**{¶33}** Then in *McCoy,* the Court considered whether trial counsel's concession of guilt over her client's objection in a capital case violates a defendant's "Sixth Amendment-secured autonomy." *McCoy*, 584 U.S. at 427. The *McCoy* Court clarified that *Strickland's* test for ineffective-assistance claims applies when "counsel's competence, is in issue." *Id.* at 426. In those cases, a defendant must show prejudice. *Id.* In contrast, *McCoy* involved a different Sixth Amendment right—a defendant's right to autonomy "to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *Id.* at 417-418.

**{¶34}** Under the Sixth Amendment, a defendant represented by counsel still retains his "[a]utonomy to decide that the objective of the defense is to assert innocence." *Id.* at 422. Indeed, assistance of counsel does not require "surrender[ing] control entirely to counsel." *Id.* The decision to maintain one's innocence is one of the fundamental decisions reserved to the defendant. *Id.*, citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Counsel's authority over trial-management issues does not diminish a defendant's "right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *Id.* at 417. Simply put, criminal defense under the Sixth Amendment must be a "collaborative enterprise." *Villarreal v. Texas*, 607 U.S. 465, 477 (2026); *see Faretta v. California*, 422 U.S. 806, 820 (1975) ("an assistant, however expert, is still an assistant."); *see also Gannett Co. v. DePasquale,* 443 U.S. 368, 382, fn. 10 (1979) ("the accused, and not a lawyer, is master of his own defense.").

Afterall, "[t]he defendant, and not his lawyer or the State, will bear the personal consequences of a conviction." *Faretta* at 834.

**{¶35}** Wolfert contends that *McCoy* does not require proof of an objection by a defendant to trigger a structural-error analysis. But a successful *McCoy* claim requires proof in the record that trial counsel encroached on the client's autonomy. *See Ward,* 2019-Ohio-4148, at ¶ 24 (1st Dist.); *see also State v. Roberts*, 2025-Ohio-5583, ¶ 11 (5th Dist.); *State v. Froman*, 2020-Ohio-4523, ¶ 142; *United States v. Hashimi*, 110 F.4th 621, 629 (4th Cir. 2024); *Demora v. Rivello*, 2024 U.S. Dist. LEXIS 245805, *14-15 (E.D.Pa. Aug. 29, 2024); *People v. Bernal,* 42 Cal.App.5th 1160, 1166 (2019); *Ex parte Barbee*, 616 S.W.3d 836, 845 (Tex.Crim.App. 2021); *Epperson v. Commonwealth*, 645 S.W.3d 405, 408 (Ky. 2021); *Grant v. Commr. of Correction*, 345 Conn. 683, 697 (2022).

**{¶36}** In *McCoy*, "the trial court permitted counsel . . . to tell the jury the defendant 'committed three murders. . . . [H]e's guilty.'" *McCoy,* 584 U.S. at 417. The Court held that "the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative." *Id.* at 426-427. The *McCoy* Court emphasized that, "in contrast to *Nixon*, [McCoy] vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *Id.* at 417. The concession in *McCoy* also was distinguishable from that in *Nixon* because "Nixon's attorney did not negate Nixon's autonomy by overriding Nixon's desired defense objective, for Nixon never asserted any such objective." *Id.* at 424. The Court unequivocally "agree[d] with the majority of state courts of last resort that counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." *Id.* at 426.

15

So, a *McCoy* claim requires proof in the record that trial counsel conceded guilt over the defendant's expressed desire to maintain innocence.

{¶37} Here, the record does not suggest that trial counsel defied Wolfert's decision to maintain his innocence to the domestic-violence and strangulation charges. Indeed, counsel's opening statements were consistent with Wolfert's testimony where he admitted to striking and strangling A.W., but denied causing serious physical harm to A.W. When the State cross-examined Wolfert, he told the jury that he was "willing to admit the domestic violence and the strangulation, things we know that happened."

{¶38} Moreover, there is nothing in the record to suggest that trial counsel failed to consult with Wolfert. Rather, Wolfert's testimony demonstrates that Wolfert and his trial counsel were aligned on the strategic choice to concede guilt to the lowest charges in hopes of obtaining an acquittal on the more serious felony charges. Generally, when a defense attorney defers to the defendant's wishes, counsel's assistance is not ineffective. *State v. Groves*, 2022-Ohio-443, ¶ 71 (4th Dist.).

{¶39} We have described the prospect of raising certain ineffective-assistance-of-counsel claims in a direct appeal as "incredibly difficult, if not impossible." *State v. Lemaine*, 2026-Ohio-1741, ¶ 44 (1st Dist.), quoting *State v. Collins*, 2024-Ohio-5112, ¶ 71 (1st Dist.). This is because we may not infer deficient assistance by trial counsel from a silent record. *See State v. Sawyer,* 2025-Ohio-5834, ¶ 41 (1st Dist.), citing *State v. Were*, 2008-Ohio-2762, ¶ 244. And on direct appeal, "our review is limited to the trial court record." *Id.* It is possible Wolfert has evidence that trial counsel ignored Wolfert's decision to maintain his innocence at trial to every charge or failed to consult with Wolfert before conceding his guilt. If so, his claims are "better suited for a

postconviction petition, where he can introduce evidence" demonstrating trial counsel's encroachment on Wolfert's autonomy or failure to consult with Wolfert. *Id.*

{¶40} Wolfert has failed to demonstrate that trial counsel's performance fell below an objective standard of reasonable performance under *Strickland* and *Nixon,* or that his trial counsel's concession usurped his Sixth Amendment-secured autonomy under *McCoy*. Therefore, we overrule Wolfert's first assignment of error.

### B. Second assignment of error: the sufficiency and weight of the evidence support Wolfert's convictions

{¶41} Wolfert claims that the State's evidence did not prove that he used force to purposely compel A.W. to engage in sexual conduct.

#### 1. *The State's evidence sufficed to prove that Wolfert used the threat of force to compel A.W.'s submission to sexual conduct*

{¶42} In a sufficiency-of-the-evidence review, we view the evidence in the State's favor and ask whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Johnson*, 2008-Ohio-705, ¶ 15 (1st Dist.), quoting *State v. Waddy*, 63 Ohio St.3d 424, 430 (1992).

{¶43} Wolfert was convicted of rape in violation of R.C. 2907.02(A)(2), which criminalizes "sexual conduct with another when the offender purposely compels the victim to submit by force or threat of force." Under R.C. 2901.01(A), "force" means "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." So, the State must prove that the defendant wielded "violence, compulsion, or constraint against the victim through physical means or [] create[d] the belief that physical force will be used if the victim does not submit." *In re J.A.*, 2023-Ohio-4388, ¶ 30 (1st Dist.), citing R.C. 2901.01(A)(1).

{¶44} A rape conviction under R.C. 2907.02(A)(2) requires proof that a defendant's use or threat of force caused the victim to submit to sexual conduct. *State*

*v. Heiney*, 2018-Ohio-3408, ¶ 102 (6th Dist.). And the evidence must prove that the defendant deployed force or the threat of force with the purpose of causing the victim's submission. Purpose, as it relates to criminal offenses, refers to a "specific intent" to "cause a certain result." R.C. 2901.22(A). Absent an admission, a defendant's mental state must "'be determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances.'" *State v. Hartman*, 2016-Ohio-2883, ¶ 27 (2d Dist.), quoting *State v. Mundy*, 99 Ohio App.3d 275, 288 (2d Dist. 1994).

**{¶45}** Wolfert maintains that a reasonable trier of fact could not find that he used force to compel A.W. to submit to sexual conduct. In support, he cites the interruptions and breaks between his physical force and sexual acts, the lack of explicit threats of force, and his lack of physical control over A.W. during the sexual conduct.

**{¶46}** A "threat" is "'an expression of intention to inflict evil, injury, or damage.'" *State v. Vega-Medina*, 2024-Ohio-3409, ¶ 24 (8th Dist.), quoting *Merriam-Webster Online*, https://www.merriam-webster.com/ dictionary/threat (accessed June 24, 2024). Relevant here, a threat can consist of "'a range of statements or conduct intended to impart a feeling of apprehension in the victim . . . of bodily harm.'" *Id.*, quoting *State v. Cress*, 2006-Ohio-6501, ¶ 39. For rape offenses, "threats of force may be implied by the circumstances" because "the rape statute does not require explicit threats of force." *Id.,* citing *State v. Rupp*, 2007-Ohio-1561, ¶ 32 (7th Dist.).

**{¶47}** Wolfert is correct that the videos show brief portions of the five-to-six hours that Wolfert was in A.W.'s apartment. He testified that he and A.W. ate food and talked after the physical violence, which he cites as proof that the tenor had shifted before the sexual acts.

**{¶48}** But the sexual conduct in this case cannot be viewed in isolation. Earlier, Wolfert choked and punched A.W. while berating and interrogating her for allegedly

engaging in sex work. And Wolfert referenced having "just beat the fuck out of [A.W.]" when he demanded sexual acts from A.W. for his $800 support payment. When A.W. tried to discuss the matter, Wolfert told her to "shut the fuck up, I don't want to hear it, $800 bitch." Seconds before the sexual conduct, Wolfert suggested that he "might" follow through with his threats. And when A.W. complained that her jaw hurt during the fellatio, Wolfert remarked that he could "make it hurt 10 times more."

**{¶49}** A reasonable trier of fact could find that Wolfert used the threat of force to compel A.W. to submit to sexual conduct considering actual threats of physical violence to A.W. prior to, and during, the sexual conduct. And a reasonable trier of fact could find that Wolfert, sitting on the couch in his underwear referencing A.W.'s sex work in a low, ominous tone was inconsistent with an invitation for consensual sexual conduct. Rather, a rational trier of fact would conclude that Wolfert's earlier assault was the subtext of his remarks and served to remind A.W. of what Wolfert might do. Therefore, the evidence was sufficient to prove that Wolfert used the threat of force to purposely compel A.W. to engage in multiple acts of sexual conduct.

## 2. *Wolfert's convictions are not contrary to the weight of the evidence*

**{¶50}** Wolfert also argues that his convictions were against the manifest weight of the evidence because the totality of the circumstances, including "the temporal gap, the intervening activities, the passive positioning, and the absence of contemporaneous threats" prove that he did not use or threaten force to purposely compel A.W. to submit to sexual conduct.

**{¶51}** A manifest-weight "challenge looks to whether the State met its burden of persuasion." *State v. Reillo,* Slip Opinion No. 2026-Ohio-2701, ¶ 24. This court may reverse a conviction as against the manifest weight of the evidence and order a new trial if it finds, following an independent review of the record, """the jury clearly lost

its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.""" *Id.*, quoting *State v. Brown*, 2025-Ohio-2804, ¶ 30, quoting *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus.

{¶52} The weight of the evidence supports Wolfert's convictions. Combined, the footage and A.W.'s testimony weigh heavily in support of the jury's verdicts and the conclusion that Wolfert purposely used the threat of force to compel A.W. to submit to sexual conduct. While Wolfert testified that he never intended to suggest that he would use force if A.W. did not submit to sexual conduct, the jury disbelieved his testimony when it found him guilty of rape. As a general rule, we defer to the jury's credibility finding as it is in the "superior position to decide which testimony to believe and which to disregard." *Reillo* at ¶ 32. And from our vantage point, Wolfert's testimony lacks credibility.

{¶53} We overrule the second assignment of error.

### C. Third assignment of error: the trial court failed to make the necessary consecutive-sentencing findings under R.C. 2929.14(C)

{¶54} Wolfert argues that the trial court erred when it imposed consecutive sentences without making the findings required by R.C. 2929.14(C)(4). He also argues that the record does not support the trial court's findings. We agree with Wolfert that the trial court failed to make findings necessary for consecutive sentences, rendering his sentence contrary to law.

{¶55} When issues surrounding consecutive felony sentences are raised on appeal, we may increase, reduce, modify, or vacate the consecutive sentences if we clearly and convincingly find "[t]hat the record does not support the sentencing court's

findings under . . . [R.C.] 2929 14[C](4)" or if the consecutive sentences are "contrary to law." R.C. 2953.08(G)(2)(a)-(b).

{¶56} When an Ohio court sentences a defendant to prison terms for multiple criminal offenses, R.C. 2929.41(A) creates a presumption that the prison terms will run concurrently. *See State v. Beatty,* 2024-Ohio-5684, ¶ 17; *see also State v. Bonnell,* 2014-Ohio-3177, ¶ 23. As an exception to that general rule, R.C. 2929.14(C) authorizes consecutive sentences if the trial court makes certain "statutory findings prior to imposing consecutive sentences." *Bonnell* at ¶ 26; *see State v. Matthews,* 2024-Ohio-1863, ¶ 24 (1st Dist.). The trial court must announce its findings at the sentencing hearing, thereby giving notice to the defendant and assisting with appellate review. *See Bonnell* at ¶ 29; *see also State v. Bell*, 2025-Ohio-2489, ¶ 19 (3d Dist.); *State v. Corbett*, 2023-Ohio-556, ¶ 28 (5th Dist.).

{¶57} Specifically, a court imposing consecutive sentences must find "(1) that consecutive sentences are necessary to protect the public or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the conditions in R.C. 2929.14(C)(4)(a)-(c) applies." *State v. Sprague*, 2023-Ohio-4343, ¶ 17 (6th Dist.), citing R.C. 2929.14(C)(4). In its sentencing entries, the trial court cited R.C. 2929.14(C)(4)(b), which allows consecutive sentences if the trial court finds that:

> two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

21

**{¶58}** During Wolfert's sentencing hearing, the trial court failed to find that consecutive sentences were necessary, proportionate, or justified by the great or unusual harm caused by offenses committed in the same course of conduct. True, Ohio law does not require "a word-for-word recitation of the language of the statute" when imposing consecutive sentences. *Mathews* at ¶ 27. But the trial court's findings at the hearing were limited to felony-sentencing findings and "seriousness and recidivism factors" under R.C. 2929.11 and 2929.12. Those findings did not satisfy the trial court's obligations under R.C. 2929.14(C). *See id.* at ¶ 28.

**{¶59}** Therefore, we sustain Wolfert's third assignment of error, reverse the imposition of consecutive sentences, and remand this cause to the trial court for a resentencing hearing to determine whether consecutive sentences should be imposed and, if so, to make the required R.C. 2929.14(C)(4) findings.

### D. Fourth assignment of error: The trial court reasonably denied Wolfert's request for a continuance

**{¶60}** Wolfert's fourth assignment of error argues that the trial court abused its discretion when it denied his request to continue his criminal trial based on his mother's unexpected travel delay.

**{¶61}** A trial court's decision to grant or deny a continuance is an exercise of its "'sound discretion.'" *State v. Urbina*, 2021-Ohio-4254, ¶ 11 (3d Dist.), quoting *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). We will reverse the trial court's denial of Wolfert's request for a continuance if Wolfert demonstrates the trial court abused its discretion. *State v. Brown*, 2005-Ohio-4590, ¶ 6 (1st Dist.). A trial court abuses its discretion if its decision is "unreasonable, arbitrary, or unconscionable." *Id.*

**{¶62}** Denying a defendant's continuance request may affect that defendant's fundamental due-process right to a "reasonable opportunity to prepare his case." *State*

*v. Sowders*, 4 Ohio St.3d 143, 144 (1983). But that certainly is not true in every case. *Id.* Rather, such a denial violates a defendant's due-process rights when it is based on "a myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Unger v. Saralife* 376 U.S. 575, 589 (1964). Whether a trial court's denial of a continuance is "so arbitrary as to violate due process" depends on the "circumstances present" and "particularly in the reasons presented to the trial judge." *Id.*

**{¶63}** The decision to grant or deny a continuance rests on competing interests. So, the "trial court must balance the need to control its docket, and the right of the nonmoving party to a disposition of the cause, against the prejudice to the moving party resulting from failure to grant the continuance requested." *State v. Packer*, 2010-Ohio-2627, ¶ 24 (6th Dist.). Ohio courts have identified several factors that bear on a court's decision to grant or deny a continuance, including:

> (1) the length of the delay requested; (2) whether other continuances
> have been granted; (3) the inconvenience to the litigants, witnesses,
> opposing counsel, and the court; (4) whether the requested delay is for
> legitimate reasons or whether it is dilatory, purposeful, or contrived; (5)
> whether the defendant has contributed to the circumstance that gives
> rise to the request for a continuance; and (6) other relevant factors.

*State v. Stegall*, 2012-Ohio-3792, ¶ 33 (1st Dist.).

**{¶64}** First, the number of continuances granted to Wolfert supports the trial court's decision. The trial court had already granted Wolfert six continuances that postponed his trial before it denied Wolfert's final request. Wolfert's trial initially was scheduled for February 2025. Wolfert's continuances, combined with the State's lone continuance, moved his trial date to July 2025.

**{¶65}** Second, Wolfert's open-ended and vague request weighed in favor of the trial court's decision. Wolfert sought another continuance 18 minutes before trial was set to begin and based the request on his mother's unavailability to testify as a "key witness" in his defense. When a party moves for a continuance "to secure the attendance of witnesses, 'it is incumbent upon the moving party to show that such witnesses would have given substantial favorable evidence and that they were available and willing to testify.'" *State v. Komadina*, 2003-Ohio-1800, ¶ 32 (9th Dist.), quoting *State v. Meek*, 1997 Ohio App. LEXIS 193 (9th Dist. Jan. 22, 1997). Courts have affirmed a trial court's decision to deny a request for a continuance based on "the lack of information presented to the trial court at the time of the request." *Sowders*, 4 Ohio St.3d 145; *see Unger*, 67 Ohio St.2d at 69; *Komadina* at ¶ 32 (holding that a motion for a continuance to secure a "critical witness" who "did witness some of the events in dispute" failed to convey "how the testimony would be favorable to the defense or give the amount of time it would be necessary to locate [the witness].").

**{¶66}** Wolfert's motion informed the trial court that his mother was vacationing in Germany with her husband, who was injured before the two were scheduled to return to Ohio, and could not leave Germany before the trial. Trial counsel learned this information the Friday before the Monday trial date, and he promised to provide the trial court with documentation at some point in the future. Wolfert identified his mother as a "key witness" who would "provide testimony for the Defense that no other witness can provide, and can provide necessary impeachment of the State's chief witness depending on her testimony." Wolfert's request was vague and indefinite as it did not explain when his mother would be available to testify.[4]

---

[4] Wolfert did not ask the court for permission for his mother's remote participation under Crim.R. 40(B).

**{¶67}** Considering the trial court's previously granting six continuances and the vague, open-ended nature of Wolfert's request for a seventh continuance, the trial court's decision denying Wolfert's request did not rise to an abuse of discretion. Therefore, we overrule his fourth assignment of error.

### III. *Conclusion*

**{¶68}** We overrule Wolfert's first, second, and fourth assignments of error and affirm his convictions. But we sustain Wolfert's third assignment of error, reverse the consecutive nature of his sentences, and remand the cause to the trial court to determine whether consecutive sentences are appropriate, and if so, to make the required findings under R.C. 2929.14(C)(4).

Judgment accordingly.

**CROUSE, P.J.,** and **NESTOR, J.,** concur.